Charles **KOCH, Nancy Koch, Tim Koch, David Koch, Michael Koch, Jennifer Koch, and Brenna Marie Koch, d/o/b 6–17–89 and Andrew Christopher Koch, d/o/b/ 12–17–91, minor children, by and through their next friend and natural father, Tim Koch, and Allen David Koch, d/o/b 8–23–95, a minor, by and through his next friend and natural father, David Koch, Plaintiffs,**

v.

**SHELL OIL COMPANY, Feed Specialties Co., Inc., and Occidental Chemical Corp., f/k/a Diamond Shamrock Corp., Defendants.**

No. CIV. A. 92–4239–DES.

United States District Court,
D. Kansas.

May 4, 1999.

Robert V. Eye, Irigonegaray & Associates, Ronald R. Hein, Stephen P. Weir, Hein & Weir, Chartered, Topeka, KS, for Plaintiffs.

Hal D. Meltzer, Gregory N. Pottorff, Turner & Boisseau, Chartered, Overland Park, KS, James P. Nordstrom, Fisher, Patterson, Sayler & Smith, Topeka, KS, Bryce A. Abbott, Martin, Churchill, Blair, Hill, Cole & Hollander, Chtd., Wichita, KS, for defendants.

### *MEMORANDUM AND ORDER*

SAFFELS, District Judge.

This matter is before the court on defendant Shell Oil Company's Motion for Summary Judgment (Doc. 330), defendant Shell Oil Company's Motion in Limine to Exclude Testimony by Plaintiffs' Expert Witnesses Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (Doc. 343), defendant Feed Specialties Co., Inc.'s Motion for Summary Judgment (Doc. 335), defendant Feed Specialties Co., Inc.'s Motion in Limine to Exclude Testimony by Plaintiffs' Expert Witnesses Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (Doc. 356), defendant Occidental Chemical Corp.'s Motion for Summary Judgment (Doc. 337), and defendant Occidental Chemical Corp.'s Combined Motion in Limine and Motion to Exclude Expert Testimony Pursuant to *Daubert v. Merrell Dow* (Doc. 345).

For the reasons set forth below, the defendants' motions for summary judgment are granted and the defendants' *Daubert* motions are denied as moot.

## I. BACKGROUND

From April 1979 through October 1981, plaintiff Charles Koch fed his dairy cows a feed additive known as Rabon Oral Larvicide Premix ("R.O.L.Premix"). R.O.L. Premix contains Rabon Oral Larvicide, a product made from Rabon. Rabon is manufactured and sold by Shell Oil Company ("Shell") and Occidental Chemical Corp. ("Occidental"). R.O.L. Premix is distributed by Feed Specialties Co., Inc. ("Feed Specialties").

Beginning in May 1979 and continuing until July 1986, a significant number of Mr. Koch's cattle died. He purchased his last batch of R.O.L. Premix in September 1981, and ceased using the product at the end of October 1981 because he suspected that the product was involved in the death of his cattle. Mr. Koch himself has experienced health problems since the 1980s, which he attributes to his exposure to Rabon.

In March 1991, laboratory experts developed a test which they believed could detect residual Rabon deposits in fat tissue. In April 1991, these experts stated that they found the presence of Rabon in tissue taken both from Mr. Koch and from one of Mr. Koch's bulls that had died in 1981. On November 25, 1991, Mr. Koch filed suit against Shell and Feed Specialties, alleging that Rabon caused the death of a substantial portion of his dairy herd, as well as physical injuries to himself, his wife and children, and his grandchildren. Plaintiffs filed an amended complaint which added Occidental as a defendant on May 24, 1996.

All of the defendants now move for summary judgment and to exclude plaintiffs' expert witnesses pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

## II. SUMMARY JUDGMENT STANDARD

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. 2548.

Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (interpreting Fed.R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. 2548. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues"). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. 2505.

## III. *DAUBERT* STANDARD

█ The admissibility of expert testimony in federal courts is governed by Fed.R.Evid. 702, which superseded the *Frye* general acceptance test. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587–88, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. Under the Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. The trial judge's role as a gatekeeper "ap-

plies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

Pursuant to Fed.R.Evid. 104(a), the trial judge must first determine whether the testimony will be relating "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. As part of this determination, the trial judge must decide "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786.

An important consideration in making this determination about the theory or technique which will be the subject of the expert testimony is whether it can be and has been tested. *Id.* at 593, 113 S.Ct. 2786. Additionally, the trial judge should consider "whether the theory or technique has been subjected to peer review and publication." *Id.* Furthermore, the trial judge should take into consideration "the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation." *Id.* at 594, 113 S.Ct. 2786 (citations omitted). Finally, the trial judge may also consider whether the theory or technique has been generally accepted within the scientific community. *Id.*

## IV. DISCUSSION

### A. Defendant Shell's Motions

#### 1. Motion for Summary Judgment (Doc. 330)

#### a. Claims for Damages to Cattle Fail as a Matter of Law

Defendant Shell asserts that the plaintiffs have failed to disclose any expert witness who will testify that Rabon caused any illness or death of plaintiffs' cattle. Plaintiffs have not submitted any argument or evidence in their response which would refute this allegation.

The court notes that plaintiffs' expert, Dr. Ruth, has testified in depositions that he found Rabon in a sample from one of Charles Koch's cattle. However, as discussed below, the court finds that Dr. Ruth's testimony regarding the Rabon found in the tissue samples is inadmissible. Plaintiffs have not indicated that there is any other evidence which would prove that Rabon caused the problems with their cattle. Even if Dr. Ruth's testimony was admissible, that would still be insufficient to prove that Rabon, alone or in combination with some other chemical, caused the deaths of plaintiffs' cattle.

Plaintiffs bear the burden of showing a *prima facie* case, including the element of causation. Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Because plaintiffs cannot prove that Rabon caused the damages relating to the cattle, the court must grant summary judgment in favor of Shell with regard to all of the claims for damages involving plaintiffs' cattle.

#### b. Claims of the Minor Plaintiffs Fail as a Matter of Law

Shell asserts that none of the minor plaintiffs were ever directly exposed to Rabon. Furthermore, Shell argues that there has never been any testing to determine if any of the minor plaintiffs have any amount of Rabon in their bodies, nor has there been any genetic testing of the minor plaintiffs to determine if their medical problems could have been caused by their fathers' exposure to Rabon. While Shell acknowledges that the report of Dr. Heuser, one of plaintiffs' experts, indicates that the minor plaintiffs have abnormalities in their immune systems, Shell states that Dr. Heuser has no explanation for these

results since the children were never directly exposed to Rabon. Again, plaintiffs make no attempt to refute Shell's arguments in their response.

As with plaintiffs' claims involving the cattle, plaintiffs bear the burden of showing a *prima facie* case, including the element of causation. Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

█ Plaintiffs have not indicated that there is any evidence which would prove that the minor plaintiffs' medical problems were caused by Rabon. Furthermore, plaintiffs have not even established that the minor plaintiffs have been exposed to Rabon, either directly or indirectly through their fathers. Plaintiffs have alleged that Agent Orange, which plaintiffs also allege is chemically similar to Rabon, has been found to cause spina bifida. However, the report in which this conclusion was stated has not been submitted to the court, nor does the court have before it any statement from any of plaintiffs' expert witnesses which links the chemical structure of Agent Orange to that of Rabon or which alleges that Alan Koch's spina bifida was caused by his father's exposure to Rabon. Thus, the court must conclude that there is insufficient scientific evidence to link Rabon to any of the medical conditions of the minor plaintiffs. *See Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir.1999) ("Without scientific data supporting their conclusions that chemicals similar to benzene

cause the same problems as benzene, the analytical gap in the experts' testimony is simply too wide for the opinions to establish causation").

While the court recognizes that the minor plaintiffs suffer from severe medical problems, the court cannot allow the claims of the minor plaintiffs to go forward if they are unable to meet their burden of proof on the element of causation or even to show that they were exposed to Rabon. Thus, the court finds that it must grant summary judgment in favor of Shell with regard to the claims of the minor plaintiffs—Brenna Marie Koch, Andrew Christopher Koch, and Alan David Koch.

### c. Failure of Plaintiffs to Present Admissible Evidence on the Issue of Causation and Damages

Shell argues that plaintiffs' expert witnesses do not meet the requirements of the *Daubert* test, and, therefore, the opinions of these witnesses are inadmissible. While plaintiffs have not included any arguments on this issue in their response[1], they have submitted exhibits which the court presumes are intended to bolster the admissibility of the opinions of their expert witnesses. The court will address the arguments pertaining to each witness in turn.

#### (1) Dr. James Ruth

Shell claims that Dr. Ruth testified during his depositions that his work was terminated before it was completed; that there were errors in his report and calculations; that he has never utilized the methodology and protocol that he developed for this case on any other sample; that he has never submitted this methodol-

---

1. The court notes that plaintiffs' response brief fails to address any of the arguments relating to the expert witnesses. Without a specific reference, the court is under no obligation to "search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1025 (10th Cir.1992), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992); *accord*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Nonetheless, out of an abundance of caution, the court has reviewed the entire record, including plaintiffs' responses to the other summary judgment motions and *Daubert* motions, in an effort to resolve any questions in favor of plaintiffs as the nonmoving party.

ogy for peer review; that he is not aware of the use of this methodology to test for the presence of any other chemical substance in human or animal tissue; that he could not reconstruct his calculations; that he did not make duplicate or triplicate runs of the final experiments because the project was abruptly terminated; that he knew nothing about the initial samples that he tested or how the samples were prepared; and that he could not testify, based upon reasonable scientific probability, that Rabon was present in the samples taken from Charles Koch and one of his cattle because he was unable to perform the proper scientific analysis as a result of the project's termination. Again, plaintiffs have not submitted any arguments in their response which would refute these claims.

In order to determine whether the methodology underlying Dr. Ruth's testimony is scientifically valid and whether that methodology properly can be applied to the facts of this case, the court must consider the following factors: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted within the scientific community. *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786.

■ With regard to the first factor, Dr. Ruth testified that this was a technique that he developed, "using common sense from the standpoint of chemistry," to attempt to find Rabon in the tissue samples. Ruth Dep., vol. 1, at 45–46. He further testified that, to the best of his knowledge, this procedure had never been used before to analyze Rabon in fat samples, and he has not used this procedure since. *Id.;* Ruth Dep., vol. 2, at 126. In addition, Dr. Ruth testified that there was obviously a mistake somewhere in his calculations and that he was unable to reconstruct his calculations, so he could not identify what the

problem was. Ruth Dep., vol. 2, at 172–73. Dr. Ruth also testified that they only established a rough estimate of the amount of Rabon present in the samples and that they were not asked to provide statistical analysis of the results. *Id.* at 174, 176. *See also id.* at 188–89 (discussing inability to reconstruct information contained in figures 14d and 12 which were attached to his report). Dr. Ruth testified that he did not know how the fat sample with which he had worked had been extracted from the original tissue sample. *Id.* at 164–65. He also agreed that he had some concerns from the beginning of the project because the samples were very old and he did not know the initial sample sizes. *Id.* at 193. Finally, Dr. Ruth testified that the fat samples, along with the Rabon standard, were left behind to be destroyed when his lab moved. Ruth Dep., vol. 1, at 70. Thus, there would be no way to try to reproduce these experiments with the original samples. As a result, the court finds that Dr. Ruth's test results are not reliable and that this factor weighs against the admissibility of his testimony.

With regard to the second factor relating to peer review and publication, Dr. Ruth testified that he had not ever submitted this methodology for peer review to determine its validity, reliability, and reproducibility. Ruth Dep., vol. 2, at 126. Therefore, this factor also weighs against the admissibility of Dr. Ruth's testimony.

With regard to the third factor relating to the rate of error, Dr. Ruth testified that a twenty (20) percent rate of error would be a "fair estimation." Ruth Dep., vol. 1, at 108–09. The court is somewhat concerned that the rate of error involved is an estimation. Furthermore, the court is also concerned that an error rate of twenty percent seems rather high; however, the court found no explanation in Dr. Ruth's testimony as to whether this was considered a typical rate of error for this type of experiment. Thus, the court concludes that this factor also does not weigh in favor of admissibility.

With regard to the general acceptance of the methodology used by Dr. Ruth, there is no direct evidence before the court on this point. However, the court again notes that Dr. Ruth developed this "common sense" procedure himself, the procedure has not been submitted for peer review, and there is nothing before the court which would indicate that this procedure has ever been used again. As a result, the court concludes that this factor also weighs against the admissibility of this testimony.

Thus, the court finds that all four of the *Daubert* factors weigh against the admissibility of Dr. Ruth's testimony. In particular, the court is extremely concerned with the scientific validity and reliability of the testing performed by Dr. Ruth, as discussed above in relation to the first *Daubert* factor. Dr. Ruth's testimony indicates that he himself cannot reconstruct the calculations that he performed to reach his results. Since Dr. Ruth is unable to reconstruct that information and believes that there are mistakes in his calculations, the court is unable to find that the results of his testing were valid and reliable. Therefore, the court concludes that Dr. Ruth's testimony is inadmissible pursuant to Fed.R.Evid. 104(a) and 702.

Furthermore, in order for the plaintiffs to prove that they were exposed to and injured by Rabon, the plaintiffs must show " 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff[s'] actual level of exposure to the defendant[s'] toxic substance.' " *Mitchell,* 165 F.3d at 781 (quoting *Wright v. Willamette Industries, Inc.,* 91 F.3d 1105, 1106 (8th Cir.1996)). Dr. Ruth admitted that he did not know what the level of toxicity was for cattle. Ruth Dep., vol. 1, at 60. Although the court could not find any such statement relating to the level of exposure which would be toxic for humans, Dr. Ruth did state that he was aware of the type of experiment that should be done to determine a toxic dose for humans and cattle, but that apparently was not done in this case. Ruth Dep., vol. 2, at 178–79. Furthermore, Dr. Ruth admitted that he did not look for any substance other than

Rabon when he conducted his tests. Ruth Dep., vol. 1, at 58. Thus, even if his testimony was admissible, Dr. Ruth's testimony cannot demonstrate the level of exposure that would be hazardous, nor could his testimony demonstrate that Rabon caused any of the plaintiffs' medical problems.

Finally, the court notes that Dr. Ruth only tested samples from one bull and from Charles Koch. He did not test any tissue samples from other family members. Therefore, the other adult plaintiffs could not rely on Dr. Ruth's testimony to show that Rabon also was present in their tissue, even if his testimony was admissible.

### (2) Dr. Harvey Loomstein

■ Shell claims that Dr. Loomstein stated during his deposition that he could not testify as to the cause of Charles Koch's brain damage; that he could not offer any opinions as to the other adult plaintiffs; and that he could not testify to a reasonable degree of certainty that exposure to Rabon contributed to Charles Koch's brain damage. Again, plaintiffs have not directly addressed this issue in their response to the motion for summary judgment.

■ Pursuant to Fed.R.Evid. 104(a) and 702, the court must first determine whether Dr. Loomstein's proposed testimony will relate scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. Whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue is primarily a question of relevance. *Id.* at 591, 113 S.Ct. 2786. While it is clear that Dr. Loomstein's testimony would relate scientific knowledge, it is not entirely clear for what purpose plaintiffs would seek to introduce this evidence. It appears that Dr. Loomstein's testimony would be more related to the issue of damages than to causation.

During Dr. Loomstein's deposition, he testified that he could not state what had

caused Charles Koch's brain damage, but he believed that chemical exposure was part of it. He further testified that Rabon exposure was a contributing factor, but he could not say to what degree. Loomstein Dep. at 133–34. Although the court has reviewed the copy of Dr. Loomstein's report that was submitted with plaintiff's response to Occidental's *Daubert* motion, it is unclear how Dr. Loomstein has reached his conclusion that Rabon was a contributing factor to Charles Koch's brain damage. There is nothing in the report which indicates that Dr. Loomstein conducted any tests which would determine whether Rabon was present in Charles Koch's body. While Dr. Loomstein refers to blood tests performed by another laboratory which indicate that Charles Koch's immune system has been compromised, his report does not explain how he reached the conclusion that the compromise was caused by his exposure to Rabon, rather than some other substance.

Dr. Loomstein seems to have developed this opinion primarily from Dr. Ruth's work on the fat samples and from Charles Koch's own statements regarding his exposure to Rabon. Dr. Loomstein's report does not indicate that he even asked Charles Koch if he had been exposed to any other pesticides or chemicals, although he seems to assume that Mr. Koch was exposed to other chemicals. Therefore, the court must conclude that, while Dr. Loomstein's testimony may be relevant to illustrate Mr. Koch's current medical condition for the issue of damages, his testimony is not scientifically reliable nor relevant on the issue of causation. Furthermore, the court again notes that Dr. Loomstein's testimony would only pertain to Charles Koch since none of the other adult plaintiffs were examined by Dr. Loomstein.

### (3) Dr. Aristo Vojdani

Shell argues that Dr. Vojdani cannot testify that the blood tests which he performed show that Rabon was the cause of the alleged damage to the plaintiffs' immune systems. Specifically, Shell asserts

that Dr. Vojdani testified that he did not know to what other chemicals the plaintiffs may have been exposed and that it is outside the scope of his expertise to determine what caused the abnormalities in plaintiffs' immune systems. Again, plaintiffs did not specifically address this argument in their response.

As previously stated, Rule 702 requires that proposed scientific testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R.Evid. 702. As recognized by the Supreme Court in *Daubert*, this condition relates primarily to the issue of relevance. *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786.

Dr. Vojdani testified during his deposition that he could not say that Rabon had damaged the plaintiffs' immune systems. Vojdani Dep. at 169–70. He also testified that he did not personally examine Charles Koch, nor did he take a history from Mr. Koch. *Id.* at 41–42. Therefore, he had no way of knowing to which chemicals the plaintiffs may have been exposed. *Id.* at 42. Furthermore, Dr. Vojdani testified that he also found abnormalities in the blood work that he conducted on Gina Koch, Tim Koch's wife, even though she had never been exposed to Rabon, had never eaten any of the meat from the cattle, and never drank any of the milk from the cattle. *Id.* at 133–34. Thus, while this testimony may have some limited relevance to show that the plaintiffs have damage to their immune systems, Dr. Vojdani's testimony cannot be used for the purpose of proving that Rabon caused the injuries which they are alleging.

### (4) Dr. Gunnar Heuser

■ Shell asserts that Dr. Heuser's opinions are unreliable because he concluded that the plaintiffs' immune system abnormalities were caused by exposure to Rabon without reviewing any of the plaintiffs' medical records; that Dr. Heuser had not even talked to any of the plaintiffs, nor had he reviewed the results of the immune function tests, before he reached his conclusion; that the testing Dr. Heuser and

Dr. Vojdani conducted cannot link Rabon, or any other specific chemical, to the abnormal results; that Dr. Heuser has never conducted any research on organophosphates, such as Rabon, besides simply looking at abstracts of articles; and that Dr. Heuser does not know what level of Rabon would cause toxic effects in humans, nor does he know what type of effect ingestion of Rabon would have on a person. Once again, plaintiffs did not address this argument in their response.

While Rule 702 requires the court to make a preliminary assessment regarding the relevancy of proposed scientific evidence, Rule 104(a) requires the court to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. Thus, the trial judge must ensure that the proposed scientific testimony is reliable. *Id.* at 589, 113 S.Ct. 2786.

As an initial matter, the court notes that Dr. Heuser apparently did not examine Charles Koch until approximately one week prior to his deposition. Heuser Dep. at 27–28. Even though he had not personally examined Charles Koch until shortly before the deposition and did not personally examine any of the other family members, Dr. Heuser prepared an initial report stating that Rabon was the cause of the Koch family immune system abnormalities approximately nine months prior to the deposition. *See* Heuser Report dated March 28, 1996. However, Dr. Heuser admitted during his deposition that he never asked Charles Koch what other chemicals he had used in his farming operations. Heuser Dep. at 46–47. Dr. Heuser also stated that he had not even talked to Charles Koch at the time that he prepared his initial report. He had only reviewed medical records, and any historical information he had received had come from plaintiffs' attorneys. *Id.* at 141–42. In addition, Dr. Heuser admitted that his tests only indicate that there was past exposure to chemicals, but the tests do not indicate which specific chemical caused the abnormalities. *Id.* at 132. Finally, Dr. Heuser admitted that he had no knowledge or information that the amount of Rabon found in the samples examined by Dr. Ruth exceeded the maximum tolerance levels for either humans or cattle. *Id.* at 95–96.

Again, in order for the plaintiffs to prove that they were exposed to and injured by Rabon, the plaintiffs must show "'the levels of exposure that are hazardous to human beings generally as well as the plaintiff[s'] actual level of exposure to the defendant[s'] toxic substance.'" *Mitchell,* 165 F.3d at 781 (quoting *Wright v. Willamette Industries, Inc.,* 91 F.3d 1105, 1106 (8th Cir.1996)). As stated above, Dr. Heuser cannot testify as to either the level of exposure which would be hazardous to humans or to the plaintiffs' actual levels of exposure. Furthermore, Dr. Heuser admitted that the tests he conducted would not prove that Rabon had caused the abnormalities. Those tests only indicated that the plaintiffs had been exposed to some toxic substance, and Dr. Heuser never inquired to which other toxic substances the plaintiffs may have been exposed. Therefore, the court finds that Dr. Heuser's testimony is inadmissible, that his testimony is too speculative to be reliable, and his tests did not show that Rabon was the cause of the plaintiffs' immune system abnormalities. Furthermore, his conclusions rely in part upon the testing conducted by Dr. Ruth, whose testimony has already been excluded.

### (6) Conclusion

As previously stated, plaintiffs bear the burden of showing a *prima facie* case, including the element of causation. Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

As a result of the above findings with regard to plaintiffs' expert witnesses, the court finds that the adult plaintiffs are unable to prove the element of causation. Therefore, the adult plaintiffs have not met their burden of proving a *prima facie* case, and the court must grant summary judgment to defendant Shell on these claims as well. Because the court has concluded that the plaintiffs have not met their burden with respect to the element of causation, it is not necessary for the court to consider the remaining arguments raised by Shell in its motion for summary judgment.

### 2. Motion in Limine to Exclude Testimony by Plaintiffs' Expert Witnesses Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (Doc. 343)

The court need not consider Shell's arguments with regard to this motion based upon the result reached on Shell's summary judgment motion. Therefore, this motion is denied as moot.

### B. Defendant Occidental Chemical Corporation's Motions

### 1. Motion for Summary Judgment (Doc. 337)

In its motion, Occidental merely adopts Shell's motion for summary judgment and the memorandum in support of that motion. For the same reasons discussed above, the court concludes that summary judgment should be granted to Occidental on all claims.

### 2. Combined Motion in Limine and Motion to Exclude Expert Testimony Pursuant to *Daubert v. Merrell Dow* (Doc. 345)

As a result of the decision above on Occidental's summary judgment motion, the court finds that this motion should be denied as moot.

### C. Defendant Feed Specialties' Motions

### 1. Motion for Summary Judgment (Doc. 335)

Defendant Feed Specialties seeks summary judgment on substantially the same grounds as those set forth in Shell's motion for summary judgment. Although plaintiffs did address the arguments relating to the expert witnesses in their response to this motion for summary judgment, plaintiffs essentially argue that *Daubert* should not apply to the testimony of their expert witnesses. In addition, plaintiffs argue that there are no other known causes for plaintiffs' injuries.

However, the court cannot agree. As discussed above, the court finds that *Daubert* does apply to the proposed expert testimony in this case. Furthermore, the plaintiffs have not even attempted to rule out causes other than Rabon. *See* Ruth Dep., vol. 1, at 58 (stating that they did not test for any substance other than Rabon). Therefore, for the reasons stated above with regard to Shell's motion for summary judgment, the court concludes that defendant Feed Specialties should be granted summary judgment against the plaintiffs on all claims.

### 2. Motion in Limine to Exclude Testimony by Plaintiffs' Expert Witnesses Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (Doc. 356)

As a result of the decision reached above on Feed Specialties' motion for summary judgment, the court finds that this motion should be denied as moot.

**IT IS THEREFORE BY THE COURT ORDERED** that defendant Shell Oil Company's Motion for Summary Judgment (Doc. 330), defendant Feed Specialties Co., Inc.'s Motion for Summary Judgment (Doc. 335), and defendant Occidental Chemical Corp.'s Motion for Summary Judgment (Doc. 337) are granted.

**IT IS FURTHER ORDERED** that defendant Shell Oil Company's Motion in Limine to Exclude Testimony by Plaintiffs' Expert Witnesses Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (Doc. 343), defendant Feed Specialties Co., Inc.'s Motion in Limine to Exclude Testimony by Plaintiffs' Expert Witnesses Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (Doc. 356), defendant Occidental Chemical Corp.'s Combined Motion in Limine and Motion to Exclude Expert Testimony Pursuant to *Daubert v. Merrell Dow* (Doc. 345) are denied as moot.