**Raymond BURLESON Plaintiff,**

v.

**Nolan GLASS, Billy West, and Joe White, Defendants.**

**No. CIV.W–97–CA–335.**

United States District Court, W.D. Texas, Waco Division.

May 7, 2003.

Bernardo S. Garza, Callier & Garza, LLP, Houston, TX, Jamshyd Zadeh, Law Office of Jim Zadeh, P.C., Fort Worth, TX, for Raymond Burleson.

Ralph C. Longmire, Office of Attorney General, State of Texas, Celamaine Cunniff, Office of the Attorney General, State of Texas, Law Enforcement Defense Division, Austin, TX, for Nolan Glass, Plant Manager, Stainless Steel Plant, Boyd Unit, TDCJ–ID, Billy West, Joe White.

## MEMORANDUM OPINION AND ORDER

MANSKE, United States Magistrate Judge.

### I.  Background

This case was originally filed on December 1, 1997 as a 42 U.S.C. § 1983 action by Raymond Burleson, a prisoner, proceeding *pro se,* against Defendants Texas Department of Criminal Justice ("TDCJ"), Texas Correctional Industries("TCI"), Gary Johnson, John Benestante, Nolan Glass, Billy West and Joe White. The Plaintiff claims that the Defendants were deliberately indifferent to his health when they allowed him to weld with 2% thoriated tungsten electrodes during the two years he worked as a welder at the Boyd Unit's stainless steel plant. Mr. Burleson asserts that this violated his Eighth Amendment right to be free from cruel and unusual punishment. He claims that his exposure to thorium dioxide, a naturally occurring radioactive element contained in thoriated tungsten welding electrodes, caused him to develop lung and throat cancer. Specifically, Mr. Burleson was diagnosed in May of 1997 with right tonsillar squamous cell carcinoma and right lung non-small cell lung cancer, poorly differentiated carcinoma. *See* Exhibit K, pg. 3, to Defendants' Motion to Exclude. Interestingly, Mr. Burleson has a forty-five year, two-pack-per-day, history of smoking. *See id.* at 1. Additionally, both of Mr. Burleson's maternal grandparents and parents died of cancer. *See id.*

The suit was originally assigned to the Honorable Walter S. Smith, Jr., United States District Judge for the Western District of Texas, Waco Division; however, it was later reassigned to Magistrate Judge Dennis G. Green on the consent of all the parties. In June of 2000, the Plaintiff's claims against Defendants Benestante, TDCJ and TCI were dismissed. On December 20, 2000, Judge Green granted Defendants Glass, West and White's motion for summary judgment. On appeal, the Fifth Circuit reversed the Magistrate Judge's decision as to Defendants Glass, West and White and remanded the case for further proceedings on November 14, 2001. The case was then reassigned to the undersigned for further proceedings. All parties have waived their right to proceed before a District Judge and have consented to the undersigned Magistrate Judge.

### A.  Fifth Circuit Decision

Raymond Burleson appealed Magistrate Judge Dennis Green's summary judgment dismissal of his 42 U.S.C. § 1983 action against defendants Nolan Glass, Billy West and Joe White. On November 14, 2001,

the Fifth Circuit determined on the evidence before it at the time that the Magistrate Judge erred in concluding that there were no genuine issues of material fact with respect to whether Mr. Burleson was exposed to levels of carcinogens sufficient to pose an unreasonable risk of serious damage to his future health. The Court held that the summary judgment evidence provided by Mr. Burleson creates a genuine issue as to whether thoriated tungsten welding electrodes pose a significant health risk. The Fifth Circuit also determined that a genuine issue of material fact exists as to each of the following issues: 1) the deliberate indifference allegedly demonstrated by each defendant; 2) whether Mr. Burleson and other inmate welders were made aware of the radioactive nature of the materials they were using or of the risks described in the Material Safety Data Sheets ("MSDS"); 3) whether Mr. Burleson wore protective gear while welding; 4) whether all the welding rods used were radioactive; and 5) whether there was adequate ventilation in the welding area during the period in which Mr. Burleson worked at the Boyd Unit.

The Fifth Circuit also determined that there was a genuine issue of material fact as to causation on the 1983 claims. Additionally, the Court considered the qualified immunity defense raised by the Defendants. The Court first noted that Mr. Burleson alleged a violation of the Eighth Amendment's right to be free from conditions of confinement which pose an unreasonable risk of damage to a prisoner's health. Next, the Court determined whether the Defendants' conduct was objectively reasonable in light of clearly established law at the time the challenged conduct occurred. The Court looked at all evidence in the light most favorable to Mr. Burleson and assumed that he was not made aware of the radioactive nature of the materials he was using or the risks described in the MSDS, that he was not

required to and did not wear protective gear, that all welding rods used by him were radioactive, and that there was inadequate ventilation in the welding area. The Court held that there was sufficient evidence in the record for a jury to conclude that each Defendant acted with deliberate indifference to significant risks to Mr. Burleson's health, such that their conduct was not objectively reasonable in light of clearly established law at the time Mr. Burleson worked at the Boyd Unit. Accordingly, the Court concluded that summary judgment was not appropriate on the subject of qualified immunity. The Fifth Circuit ultimately reversed the decision of the Magistrate Judge and remanded the case for proceedings consistent with its opinion. On remand, Plaintiff acquired counsel and is no longer proceeding *pro se.*

### B. Defendants' Motions

On August 12, 2002, Defendants filed a Motion to Exclude the Expert Testimony of Dr. Arch Carson. The basis of Defendants' Motion to Exclude is that Dr. Carson's expert testimony is unreliable under *Daubert* and Rule 702 of the Federal Rules of Evidence. Also on August 12, 2002, Defendants filed a Second Motion for Summary Judgment and Brief in Support. They assert that there are no genuine issues as to any material fact and that they are entitled to judgment as a matter of law. The Court offered both parties an opportunity to present oral argument or testimony on behalf of their respective positions; however, neither party accepted the Court's offer.

## II. Defendant's Motion to Exclude Expert Testimony of Dr. Arch Carson

### A. Dr. Arch Carson's Background and Opinions

Plaintiff's expert, Dr. Arch Carson, has provided an initial report (June 14, 2002),

two oral depositions (July 16 and 20, 2002), and an affidavit (February 6, 2003). By way of qualifications, Dr. Carson received his Bachelor of Science in Biological Sciences with Concentration in Engineering from the University of Cincinnati in 1973. Exhibit 1, pg. 2, to Plaintiff's Response to Defendants' Motion to Exclude. He received his Ph.D. in Environmental Health—Toxicology from the Kettering Laboratory, University of Cincinnati College of Medicine in 1987. *Id.* Dr. Carson also received his medical degree from Ohio State University College of Medicine in 1990. *Id.* In 1991, Dr. Carson completed a postgraduate internship in Internal Medicine at New York University Medical Center and Bellevue Hospital Center. *Id.* In 1992, he completed his residency in Occupational Medicine at the University of Texas Health Science Center. *Id.* Dr. Carson worked as a Research Technologist in Occupational Medicine and Clinical Studies at the University of Cincinnati College of Medicine. *Id.* From 1978–87, Dr. Carson served as an instructor, lecturer and adjunct assistant professor of Industrial Toxicology at the University of Cincinnati College of Medicine. *Id.* Dr. Carson has been a clinical instructor, consultant physician, attending physician, and assistant professor in the area of occupational medicine and toxicology. *Id.* at pgs. 1–2. Currently, Dr. Carson serves as the Corporate Medical Director for Chevron Phillips Chemical Company and as the Director of the Occupational and Environmental Medicine Residency at the University of Texas Health Science Center in Houston. *Id.* at pg. 1. Dr. Carson represents that he has board eligibility in Medical Toxicology and board certification in Occupational Medicine from the American Board of Preventive Medicine. *Id.* at pg. 3.

In his initial report, Dr. Carson states that Mr. Burleson inhaled radioactive particles while engaged in thoriated tungsten welding operations at the Boyd unit and that these particles were clearly hazardous to his health and represented a significant risk for the development of respiratory tract cancers. Exhibit 3, pg. 2, to Plaintiff's Response to Defendants' Motion to Exclude. Dr. Carson opined that this risk exceeded other risk factors, including Mr. Burleson's significant smoking history, and led to the occurrence of his cancers. *Id.* During his deposition, Dr. Carson expanded on this position and said that his opinion was based on:

> [t]he information that was presented regarding the type of work that was being performed, the intensity of that work, the personal protection-protection measures that were available and used, the ventilation in the facility, the number of welding rods that were used per unit time, the scientific literature regarding similar exposures, the product literature regarding exposures. . . .

Exhibit H, pg. 33, to Defendants' Motion to Exclude.

Dr. Carson's opinion is that the primary factor in a case such as this is the local microscopic dose of radiation that is received by the one cell that transforms into cancer, not the total dose of radiation to the body. *Id.* at 61. He asserts that the "whole body of radiation carcinogenesis demonstrates and presumes that the inciting event is the change in DNA in a particular cell that results in uncontrolled growth." *Id.* at 63. His explanation of how Mr. Burleson contracted respiratory cancers is that he inhaled a piece of welding rod or a particle of welding fume containing thorium that emitted damaging particles to the surrounding cells; this particle was a continual radiation hazard to the few local cells near it. *Id.* at 63–64. Dr. Carson refers to the above theory as the "radiation hot spot" or "microscopic flux" theory. *Id.* at 63.

In his deposition, Dr. Carson concedes that he does not routinely perform radiation dose assessments. *Id.* at 72. Dr. Carson asserts that even though he has no training or experience directly related to radioactive thorium and dose assessments of radioactive thorium, he is qualified by his training to do those assessments. *Id.* He has written no papers where he has evaluated exposure to radiation or radioactive thorium. *Id.* at 73–74. Dr. Carson initially states that he has training and experience in evaluating an individual's radiation dose from exposure to radioactive thorium contained in thoriated tungsten welding electrodes. *Id.* at 74–75. Later, he admits that he has no specific training in the area, but only training that's "directly applicable" to thorium. *Id.* at 76. Dr. Carson asserts that his general training makes him competent in this area.

Dr. Carson testifies that he has never calculated an individual's radiation exposure from being around thoriated tungsten welding electrodes. *Id.* at 77. He concedes that he has not calculated Mr. Burleson's radiation dose from being exposed to thoriated tungsten welding electrodes. *Id.* Dr. Carson states that he has no specialties or medical certifications in radiation, radiation protection, radiation dosimetry, radiation epidemiology or medical physics. *Id.* at 78.

When questioned about his theory, Dr. Carson says that the "radiation hot spot" theory has been proven in practice. *Id.* at 101. He states, "if you implant a radioactive source in the location, you get local tumors at the site of implantation. That's well described. I didn't even think it was necessary to provide references." *Id.* Dr. Carson cites as a reference a paper titled "Epidemiological Evidence of Hazard" written by R. Doll in 1996. *Id.* at 107. The paper addresses the relationship between thorium and the potential for the development of cancers and notes the lack of epidemiologic data present in the literature regarding forms of thorium other than Thoratrast, which is a medical imaging dye for which he contends there is evidence of a relationship between some cancers and even the single use of the dye. *Id.* at 108. Dr. Carson testifies that Thoratrast was used intravenously or by injection and that patients were given a "good slug of it." *Id.* at 109. He states that of the people with resulting tumors, it was a local concentration of Thoratrast, not the dose administered, that resulted in tumors. *Id.* at 110–11.

Dr. Carson provided a sworn Affidavit on February 6, 2003. In the Affidavit, he states that although he bases his opinion on a presumption of a forty-hour work-week and later learned that this was incorrect, his understanding of the amount of time Mr. Burleson spent grinding welding tips (twenty to forty per day) did not change. Exhibit 2, pg. 1, to Plaintiff's Response to Defendants' Motion to Exclude. Dr. Carson states that thorium dioxide found in welding rods is a radioactive compound emitting alpha particles and that the dust and fumes produced are both radioactive and carcinogenic. *Id.* He testifies that these fumes are readily inhaled into the respiratory system. *Id.* This alpha radiation is more dangerous than other forms of radiation and is a threat to human health. *Id.* at 1–2. Dr. Carson believes that the inhalation of radioactive materials is a serious risk and led to the development of Mr. Burleson's cancerous tumors. *Id.* at 2. He admits that there are no published studies that show a link between thoriated tungsten welding rods and lung or throat cancer. *Id.*

### B. Applicable Law

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts and data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles reliably to the facts of the case.

The United States Supreme Court interpreted Federal Rule of Evidence 702 in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court assigned to district court judges the role of "gatekeeper" for the purpose of determining whether proffered scientific testimony is both reliable and relevant. *Id.* at 597, 113 S.Ct. 2786. In determining whether the proffered testimony is reliable, the district judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid. *Id.* at 592–93, 113 S.Ct. 2786; *see also Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir.1999). In order to ascertain whether the testimony is relevant, the district judge must determine whether the reasoning or methodology can be applied to the specific facts of the case. *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786.

█ In determining whether an expert's reasoning or methodology is reliable, the Supreme Court identified several factors for a district judge to consider. *Id.* at 593–94, 113 S.Ct. 2786. The factors are: (1) whether the expert's theory can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; and (4) whether the theory or method has been generally ac-

cepted by the scientific community. *Id.* The Supreme Court makes clear that these factors do not constitute a "definitive checklist." *Id.* at 593, 113 S.Ct. 2786. In *Kumho Tire Co. v. Carmichael*, the Supreme Court declared that any of the *Daubert* factors could be used to determine reliability, but that the test should be flexibly applied. 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

### C. Analysis of whether Dr. Carson's opinion is reliable

█ Defendant contends that Dr. Carson's opinion is not reliable because 1) it is not based upon any scientific or epidemiological studies showing a statistically significant link between exposure to thoriated tungsten electrodes and lung and throat cancer and 2) that Dr. Carson's application of the "radiation hot spot" theory is not grounded in established science. Plaintiff's position is that while there may not be any published studies that demonstrate a relationship between thoriated tungsten welding rods and lung or throat cancer, there are not any studies that discount or disprove such a theory. *See* Exhibit 2, p. 2, to Plaintiff's Response to Defendant's Motion to Exclude. Concerning the "radiation hot spot" theory, Dr. Carson concedes there are not any epidemiologic studies supporting the theory, "so we're limited to laboratory based research ... [however] ... I'm not prepared to point you towards specific references, but I can get several of those very easily." *See* Exhibit H, p. 102, to Defendant's Motion to Exclude.

Having carefully reviewed all exhibits and considering the arguments of both parties, the Court finds that Plaintiff's position is unpersuasive in that it has never been tested and never been submitted for peer review. The Fifth Circuit addressed a similar issue in *Allen v. Pennsylvania*

*Eng'g Corp.*, 102 F.3d 194 (5th Cir.1996). In *Allen*, the estate of a hospital worker who died of brain cancer brought a products liability action against the manufacturer of ethylene oxide to which the worker was allegedly exposed while working at the hospital. *Id.* at 195. The issue before the Court was whether the district court acted appropriately in excluding Plaintiff's three expert witnesses from testifying that exposure to ethylene oxide caused Plaintiff's fatal cancer. *Id.* In analyzing this issue, the Fifth Circuit noted that evidence exists which suggests a connection between ethylene oxide and human lymphatic and hematopoietic cancers, but concluded that such evidence is not probative on the causation of brain cancer and upheld the lower court's ruling. *Id.* at 197. As such, the proper issue before this Court is whether it is generally accepted in the scientific community that exposure to thoriated tungsten welding electrodes causes lung and/or throat cancer.

In response to deposition questioning on the above issue, Dr. Carson testified as follows:

Q. Okay. Doctor, do you know of any studies that show a statistically significant link between exposure to the dust and fumes, from either welding or grinding, with thoriated tungsten welding electrodes and lung or throat cancer?
A. No.
Q. And certainly, no such study showing a link between the dust and fumes from thoriated tungsten electrodes and the specific type of lung and throat cancer that Mr. Burleson developed?
A. I don't believe there are any such specific studies.

*See* Exhibit I, pgs. 17–18, to Defendants' Motion to Exclude.

\* \* \* \* \* \*

Q. (By Mr. Longmire) Doctor, can you tell us what references or scientific studies exist that support your conclusions that Mr. Burleson's lung and throat cancer was caused in this manner from this microscopic lodging of a particle in his throat and lung?

A. Well, the epidemiologic studies don't exist, so we're limited to laboratory based research. Quite a bit of evidence is generated from case reports in the medical literature. I'm sorry. I'm not prepared to point you towards specific references, but I can get several of those very easily. The occurrence of local tumors at the site of implantation are very small radioactive sources.

Q. But there's no epidemiological studies that concluded this?

A. There are no—there are no epidemiologic studies that have been performed to my knowledge.

Q. So, therefore, there are none that have concluded this?

A. That is correct.

*See* Exhibit H, pgs. 101–02, to Defendant's Motion to Exclude.

Additional evidence exists in the record which supports the conclusion that Plaintiff's expert's theory has not been tested or peer reviewed. In his February 6, 2003 Affidavit, Dr. Carson concedes:

Unfortunately, there are no published studies that demonstrate a relationship between thoriated tungsten welding rods and lung or throat cancer, nor are there published studies that discount or disprove such a relationship. The specific issue has never been studied, although the idea has been addressed on numerous occasions by professional organizations and regulatory bodies.

*See* Exhibit 2, pg. 2, to Plaintiff's Response to Motion to Exclude. Additionally, Dr. Carson admits that he has not submitted any papers for publication on either the above issue or the "radiation hot spot"

theory. *See* Exhibit I, pg. 45, to Defendant's Motion to Exclude.

This Court must also consider the potential rate of error of the theory when applied. In deposition testimony, Dr. Carson was asked:

Q. What is the potential rate of error in your radiation hot spot theory?

A. Well, the radiation hot spot hypothesis really doesn't have any potential rate of error. The—the uncertainty has to do with the probability of this particular exposure resulting in a situation that produced the tumors in Mr. Burleson's case. *I think there's a significant level of uncertainty there* (emphasis supplied), but I am still convinced that this exposure was, more likely than not, responsible.

*See* Exhibit I, pg. 45, to Defendant's Motion to Exclude.

On the potential rate of error issue, the Court also finds persuasive the Defendants' position on tumor latency. Defendants argue that the two-year period from alleged exposure to tumor onset supports their position that the potential for error with respect to Dr. Carson's theory is high. The Court agrees. In his Affidavit, Dr. Carson provides that:

[t]umor latency periods published in the scientific literature represent the time between initiation of the tumor and when it is recognized as a medical issue. It can often take 10 to 15 years from an inciting event to the time that an enlarging and eventually invading tumor becomes symptomatic. Numerous cases reported in the literature that I cited, regarding thorium dioxide induced tumors, became evident in much shorter times; *some as short as four years* (emphasis supplied).

*See* Exhibit 2, p. 4, to Plaintiff's Response to Defendant's Motion to Exclude. Expounding on this issue in his deposition testimony, Dr. Carson testifies:

Q. Doctor, we know that Mr. Burleson only worked at this Boyd Unit stainless steel plant for approximately two years, so that was his exposure duration, or the duration of his exposure. Isn't that simply an insufficient period of time for his lung and throat cancer to have developed from any exposure to the thoriated tungsten welding electrodes?

A. I don't believe it's an insufficient period of time. *It is early on the scale of thorium induced tumors* (emphasis supplied) that we know of from the epidemiologic studies of Thorotrast.

Q. But isn't it true, Doctor, that Mr. Burleson's lung and throat cancer is very consistent, that latency period, with him being a heavy smoker for 40 or 45 years?

A. The latency period is consistent, yes.

Q. With the smoking?

A. Yes.

*See* Exhibit I, pg. 51, to Defendant's Motion to Exclude.

\*   \*   \*   \*   \*   \*

Q. Doctor, there's a lot of epidemiological studies that link cigarette smoking to lung and throat cancer, aren't there?

A. Yes.

Q. In fact, the specific cellular type of cancer, that Mr. Burleson developed in his lung and in his throat has been directly linked to cigarette smoking, hasn't it?

A. Yes.

*See id.* at pg. 59. Based upon the above evidence, the Court finds that the potential rate of error for Plaintiff's theory of liability is high and supports the conclusion that Dr. Carson's expert opinion is not reliable.

Finally, in determining reliability, this court should consider whether the Plaintiff's expert's theory has been generally

accepted within the scientific community. In a toxic tort action against a chemical manufacturer, the Fifth Circuit has held that "... the law cannot wait for future scientific investigation and research. We must resolve cases in our courts on the basis of scientific knowledge that is currently available." *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir.1998).

Despite the evidence presented above, the Plaintiff contends that he has presented reliable evident to the Court that supports Dr. Carson's opinion that exposure to thoriated tungsten welding rods causes lung and/or throat cancer. Dr. Carson compares this type of exposure to cases concerning Thoratrast, a medical imaging dye containing thorium that used to be administered intravenously. Dr. Carson contends that there is evidence showing that Thoratrast causes cancer, even after a single use. He also claims that there are studies linking Thoratrast to lung and throat cancer.

Dr. Carson testified that two papers addressed his "radiation hot spot" theory: "Health Effects of Exposure to Low Levels of Ionizing Radiation" by the National Academy of Science's National Research Counsel Committee on Biological Effects of Ionizing Radiation, published in 1990, and "Sources, Effects and Risks of Ionizing Radiation, Report to the General Assembly and Annexes" by the United Nations Scientific Committee on the Effects of Atomic Radiation, dated 1988. Dr. Carson pointed to an article found online through Access Science which gave the preceding two articles as references. He suggests that the article specifically discussed thorium and thorium dioxide and claims that the microscopic flux or radiation hot spot theory would apply to these elements.

In their Motion to Exclude, the Defendants have provided the Affidavit of Health Physicist Carol Berger who has reviewed Dr. Carson's claim that his "radiation hot spot" theory allows him to conclude that Burleson's cancers were caused by exposure to thoriated tungsten electrodes. *See* Exhibit D, pgs. 1–2, to Defendant's Motion to Exclude. In assessing Dr. Carson's use of this theory, Ms. Berger notes that there is no scientific evidence that welding with, or grinding the tips of, thoriated tungsten electrodes results in "radiation hot spots" to the lung and throat that results in cancer. *See id.* at pg. 4. Additionally, according to Ms. Berger, the United Nations report referenced above and relied upon for Dr. Carson's opinion that exposure to Thorostrast causes cancer, states that only liver, spleen and bone cancers were associated with the use of Thorostrat, but no mention is made in the article of lung or throat cancers. *See id.* at pg. 2. Importantly, as will be addressed in more detail in the section below, Ms. Berger notes that it is scientifically indefensible to conclude that a given encounter with radioactivity results in harm without first assessing the magnitude of the exposure. *See id.* Finally, in further addressing the articles and studies cited as references in support of Dr. Carson's opinions, Ms. Berger provides:

In his report, Dr. Carson has either referenced biased articles on the radiological impacts of thoriated tungsten welding rods (i.e., Pro–Fusion articles), articles that have nothing to do with the use of thoriated tungsten in any form or application (i.e., Granpa, Bowson, Borta, Hunacek, Liu references) or fails to acknowledge statements in his references that contradict his conclusions in this case. For example, the ATSDR fact sheet that he referenced clearly states, in Section 1.5, that "As shown in Tables 1–1, 1–2, 1–3, and 1–4, we know very little about specific exposure levels of thorium that result in harmful effects in

people or animals." And the report by Doll states, in part, that "... For most radionuclides of medical or social interest the numbers of people exposed have been too few or the doses have been too small for the observed risks to have statistical stability. Useful data are available only for thorium (from the use of Thorotrast), radium (from the medicinal use of 224Ra), radon (from the occupational exposure of 11 groups of miners) and radiodine (from its use in the treatment of thyroid cancers and thyrotoxicosis and its release in nuclear accidents)."

Accordingly, based upon the record before the Court, the Court concludes that it is not generally accepted within the scientific community that exposure to thoriated tungsten welding rods causes lung and/or throat cancer. As such, the Court further concludes that Dr. Carson's testimony and opinions on this issue are not reliable and should be excluded.

### D. Analysis of whether Dr. Carson's opinion is relevant

■ Defendants contend that Dr. Carson's opinion is not relevant to the instant case because his opinion is not based on any reliable data about the extent of Mr. Burleson's exposure, if any, to radiation from the thoriated tungsten welding rods during the relevant time period. The Fifth Circuit has identified the minimal facts necessary to sustain the Plaintiff's burden in a toxic tort case as providing "[s]cientific knowledge of the harmful level of exposure to a chemical plus knowledge that the plaintiff was exposed to such quantities." *Allen*, 102 F.3d at 199. In this case, as in *Allen*, there is no direct evidence of the level of Mr. Burleson's exposure, if any, to radiation from the thoriated tungsten welding rods.

In response to questioning on the topic of whether a radiation dose assessment is

important and/or relevant to this case, Dr. Carson testified:

Q. (By Mr. Longmire) Doctor, you would agree that it's important in a case where a person is alleging that a disease was caused by exposure to radiation that it's important, in order to determine the cause of the disease and trying to link it to that exposure, to know the amount of exposure?

A. That is correct. I would agree with you.

*See* Exhibit H, pg. 55, to Defendant's Motion to Exclude.

\* \* \* \* \* \*

Q. And, again, you've not calculated Mr. Burleson's radiation dose from being exposed to thoriated tungsten welding electrodes?

A. That's correct.

*See id.* at pg. 77.

\* \* \* \* \* \*

Q. And again, Doctor, in all the lawsuits that you've been hired as an expert to testify in, you've never completed a radiation dose assessment in any of those lawsuits, have you?

A. Not that I recall.

*See id.* at pgs. 78–79.

\* \* \* \* \* \*

Q. Do you intend to do a radiation dose assessment in this case?

A. I think—I think it's something that should be done as an exercise in this case, but I seriously doubt that it would change my opinion in any way.

*See* Exhibit I, pg. 29, to Defendant's Motion to Exclude.

\* \* \* \* \* \*

Q. So your [radiation hot spot] theory assumes a high dose of radiation?

A. That's correct.

Q. But again, you have not determined Mr. Burleson's radiation dose from his exposure to these electrodes in this case?

A. I have not measured the exposures in that environment, no.

*See id.* at pg. 36.

Based upon the above testimony and other exhibits reviewed by the Court, the Plaintiff has not presented any reliable or relevant evidence which identifies a level of exposure which is harmful nor any evidence that Mr. Burleson has been exposed to such a level. Rather, due to the lack of existing data in the record, Dr. Carson relies on speculation, guesswork and conjecture to support his theory and opinions. As such, the Court finds that Dr. Carson's opinion on this issue is not relevant and should be excluded. Accordingly, the Court will grant Defendant's Motion to Exclude the Expert Testimony of Dr. Carson.

## III. Defendant's Second Motion for Summary Judgment

### A. *Background and Summary Judgment Evidence*

In his current live pleading, the Plaintiff sets forth a claim based upon 42 U.S.C. section 1983 against Defendants Nolan Glass, Billy West and Joe White. Specifically, Plaintiff alleges that "[b]etween the years of June of 1995 to 1997 Plaintiff was forced to weld and grind with radioactive hazardous Thoriated tungsten steel at the Boyd Unit Stainless Steel Plant ...." Complaint at pgs. 3–4. Plaintiff further alleges that his exposure to the thoriated tungsten electrodes caused his lung and throat cancer. *Id.* By making him weld and grind with the thoriated tungsten electrodes, Plaintiff claims that each of the Defendants were deliberately indifferent to his health and thereby violated his Eighth Amendment right to be free from cruel and unusual punishment.

Based on the record at the time, the Fifth Circuit concluded that there were genuine issues of material fact that precluded summary judgment, including whether the use of thoriated tungsten electrodes posed a significant risk to Mr. Burleson, whether adequate ventilation was used in the plant, and whether the Defendants' actions in allowing Mr. Burleson to weld with thoriated tungsten electrodes actually caused his lung and throat cancer. The Fifth Circuit also concluded that the record evidence at the time precluded summary judgment based upon the Defendants' assertion of qualified immunity.

After completing extensive discovery, the Defendants have now filed their Second Motion for Summary Judgment alleging that the summary judgment evidence establishes that Mr. Burleson's exposure to thoriated tungsten electrodes did not cause Burleson's lung and throat cancer. Additionally, the Defendants contend that the summary judgment evidence supports a finding that their actions did not result in Mr. Burleson being incarcerated under conditions which posed an unreasonable risk of damage to his future health. Further, Defendants also allege that since exposure to thoriated tungsten does not pose a substantial risk of serious harm, they were not deliberately indifferent to Mr. Burleson's health. Finally, the Defendants suggest that their actions in allowing Mr. Burleson to weld with thoriated tungsten electrodes were objectively reasonable and; therefore, they are entitled to qualified immunity.

In support of their Second Motion for Summary Judgment, Defendants submit the following evidence:

Exhibit A–Affidavit of Carol Berger, Certified Health Physicist, dated July 18, 2002;

Exhibit B–Affidavit of Carol Berger, Certified Health Physicist, dated August 7, 2002;

Exhibit C–Affidavit of Dr. George Delclos dated August 6, 2002;

Exhibit D–Affidavit of Dr. Monte K. Smith dated March 20, 2002;

Exhibit E–Affidavit of Matthew Berkheiser, Certified Industrial Hygienist, dated July 17, 2002.

Exhibit F–Affidavit of Howard Snider dated July 27, 2002:

Exhibit G–Mr. Burleson's relevant Texas Department of Criminal Justice medical records;

Exhibit H–Mr. Burleson's relevant University of Texas Medical Branch medical records;

Exhibit I–Relevant records from Mr. Burleson's Texas Department of Criminal Justice Classification records;

Exhibit J–Relevant records from Mr. Burleson's Central Texas Department of Criminal Justice–Institutional Division File;

Exhibit K–Health Physics Society "Answer to Question # 1593 Submitted to Ask 'the Expert'" dated January 25, 2002;

Exhibit L–Material Safety Data Sheet from GTE Products Corporation;

Exhibit M–Affidavit of Lane Sims dated July 25, 2002;

Exhibit N–Affidavit of Nolan Glass dated July 29, 2002;

Exhibit O–Affidavit of Joe White dated August 2, 2002;

Exhibit P–Affidavit of Billy West dated August 1, 2002;

Exhibit Q–Excerpts from Dr. Carson's deposition, Volume 1;

Exhibit R–Excerpts from Dr. Carson's deposition, Volume 2;

Exhibit S–Health Physics Society Positions Statement-"Compensation for Diseases that Might be Caused by Radiation Must Consider the Dose" dated March 2001; and,

Exhibit T–Health Physics Society Position Statement-"Radiation Risk in Perspective" dated March 2001.

In opposition to Defendants' Second Motion for Summary Judgment, the Plaintiff has offered the following summary judgment evidence:

Exhibit 1–Affidavit of Raymond Burleson;

Exhibit 2–Affidavit of Ricky Osborne

Exhibit 3–Affidavit of Dr. Arch S. Carson dated February 6, 2003 and Report of Dr. Arch S. Carson dated June 14, 2002;

Exhibit 4–Excerpts from deposition of Dr. Carson, Volume 1;

Exhibit 5–Excerpts from deposition of Dr. Carson, Volume 2;

Exhibit 6–Excerpts from deposition of Nolan Glass

Exhibit 7–Excerpts from deposition of Joe White

Exhibit 8–Excerpts from deposition of Billy West

Exhibit 9–Defendants' Responses to Plaintiff's Third Request for Production

Exhibit 10–Fifth Circuit Court Opinion

Exhibit 11A–MSDS Sheets dated August 19, 1996;

Exhibit 11B–MSDS Sheets dated November 5, 1990;

Exhibit 11C–MSDS Sheets dated January 1994;

Exhibit 12–Warning label form 2% Thoriated Tungsten Electrode container produced by Defendants;

Exhibit 13–July 31, 1997 Memo from Texas Department of Criminal Justice Industrial Hygienist Tony Nalforne to Steve Badger;

Exhibit 14–November 5, 1999 report by the Agency for Toxic Substances and Disease Registry; and,

Exhibit 15–Order dated August 19, 2002 from the Court directing Defendants to produce names of inmates who worked in the Boyd Stainless Steel Plant from 1995–1997.

### B. Objections to Summary Judgment Evidence

#### 1. Plaintiff's Objections to Defendants' Summary Judgment Evidence

Beginning on page 23 of his response to Defendants' Second Motion for Summary Judgment, Plaintiff has set forth approximately seven (7) pages of objections to Defendants' summary judgment evidence. Having carefully considered Plaintiff's objections, the Court makes the following rulings:

1. Plaintiff objects to Defendants' Exhibit A on the grounds that a) Ms. Berger's methodology in attempting to calculate Mr. Burleson's radiation dose is unreliable and b) Ms. Berger is not qualified to render an opinion concerning the causal connection between radiation exposure and the cancers suffered by Mr. Burleson. The Court **overrules** the Plaintiff's objection concerning Ms. Berger's methodology and **sustains** the objection concerning Ms. Berger's opinion on the causal connection issue.

2. Plaintiff objects to Defendants' Exhibit B on the grounds he objected to Exhibit A. As such, the Court incorporates its rulings on Plaintiff's objections to Defendant's Exhibit B.

3. Plaintiff objects to Defendants' Exhibit C on the grounds that Dr. DeClos in not qualified to give such opinions and has not demonstrated through his affidavit that he has the appropriate background to give such opinions. The Court **overrules** Plaintiff's objection to Defendants' Exhibit C.

4. Plaintiff objects to Defendants' Exhibit D on the grounds that he is not qualified to make the opinion offered and the testimony is redundant. The Court **sustains** Plaintiff's objection to Defendants' Exhibit D.

5. Plaintiff also objects to Defendants' Exhibits E, F, M, N, O, P, S and T. The vast majority of these defense exhibits relate to the issue of qualified immunity. For the reasons set forth below, the Court does not believe it is necessary to address the qualified immunity issues. As such, the Court **overrules as moot** the Plaintiff's objections to Defendants' exhibits E, F, M, N, O, P, S, and T. The Court **sustains** Plaintiff's objection to Defendants' exhibit K. The Court notes that the Plaintiff did not object to Defendants' exhibits G, H, I, J, L, Q and R.

#### 2. Defendants' Objections to Plaintiff's Summary Judgment Evidence

In Defendants' Reply to Plaintiff's Response to Defendants' Second Motion for Summary Judgment, they jointly move the Court to strike Plaintiff's Exhibits 3, 4 and 5, which are the report, affidavit and deposition excerpts from Dr. Arch S. Carson. For the reasons set forth in the portion of this opinion granting Defendants' Motion to Exclude, the Court **sustains** Defendants' objections to Plaintiff's Exhibits 3, 4 and 5. As such, they are stricken from the record before the Court.

### C. Applicable Law

#### 1. 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 creates a cause of action against any person who, under color of law, causes another to be deprived of a

federally protected constitutional right. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress ....

Section 1983 was promulgated to prevent "... [a government official's] [m]isuse of power, possessed by virtue of state law and made possible only because the [official] is clothed with the authority of state law." *Johnston v. Lucas*, 786 F.2d 1254, 1257 (5th Cir.1986); *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (8th Amendment); *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (14th Amendment); *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986) (14th Amendment). Section 1983, however, does not grant a cause of action for every action taken by a state official. *Whitley*, 475 U.S. at 319, 106 S.Ct. 1078.

Only two allegations are required in order to state a cause of action under 42 U.S.C. § 1983. "First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Manax v. McNamara*, 842 F.2d 808, 812 (5th Cir.1988).

Allegations of a prisoner's complaint, "'however inartfully pleaded,' are held 'to less stringent standards than formal pleadings drafted by lawyers ....'" *Hughes v. Rowe*, 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). It is also clear that civil rights complaints must be pleaded with specific facts, not merely conclusory allegations. *Thompson v. City of Starkville, Mississippi*, 901 F.2d 456, 469 n. 13 (5th Cir.1990); *Elliott v. Perez*, 751 F.2d 1472, 1479 (5th Cir.1985).

### 2. Conditions of Confinement.

■■■ The thrust of Plaintiff's Complaint is that he has been subjected to cruel and unusual punishment in violation of the Eighth Amendment. "The Constitution does not mandate comfortable prisons ... but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir.1999) *quoting Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995). Specifically, a prisoner must present evidence that the defendant's conduct resulted in the prisoner being incarcerated under "conditions which [posed] an unreasonable risk of damage to [the prisoner's] future health." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir.2001). This "risk must be of such a level that today's society would not tolerate it." *Id.* In order to prevail on an Eighth Amendment conditions of confinement claim, a plaintiff must satisfy a two-prong test: (1) objectively, the deprivations must be sufficiently serious; and (2) subjectively, the defendant must evince a "deliberate indifference" to the inmate's "health or safety." *Id.; see also Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir.1998). In order to show "deliberate indifference," an inmate must show that the defendant(s) knew of and disregarded a substantial risk of serious harm to his health. *Farmer v. Brennan*, 511 U.S. 825, 837–38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Further, the prisoner

must show that the defendant(s)(1) were aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn and (2) that he actually drew an inference that such potential for harm existed. *Id.*

### 3. Summary Judgment Standard

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c). A disputed material fact is genuine if the evidence is such that a jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden to demonstrate the absence of a genuine issue concerning any material fact is on the moving party. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden can be satisfied by pointing out to the court that there is an absence of evidence to support an essential element of the non-moving party's case. *Id.* Upon such a showing, the burden shifts to the non-moving party to establish that there is a genuine issue. *Id.* at 324, 106 S.Ct. 2548. "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

The party opposing summary judgment cannot establish a genuine issue of material fact by resting on the allegations made in his pleadings. *Topalian v. Ehrman,* 954 F.2d 1125, 1132 (5th Cir.1992) *citing Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Instead, he is required to identify specific evidence in the record, and to articulate the precise manner in which that evidence supports his claim.

### D. Application

■ In their Second Motion for Summary Judgment, the Defendants allege that Mr. Burleson's lung and throat cancer were not caused by exposure to thoriated tungsten electrodes, but rather were caused by his extensive smoking history. In support of this contention, the Defendants offer evidence of Mr. Burleson's total radiation exposure from thoriated tungsten electrodes and the effect of such exposure on Mr. Burleson's propensity to develop lung and throat cancer. Specifically, the Defendants offer Exhibit A (Affidavit of Carol D. Berger dated July 18, 2002) and Exhibit B (Affidavit of Carol D. Berger dated August 7, 2002). Ms. Berger is a Certified Health Physicist with over twenty-five (25) years experience in nuclear and radiological activities with emphasis in strategic planning, radiation dosimetry, instrumentation, and applied health physics. *See* Exhibit A, at Appendix, to Defendants' Second Motion for Summary Judgment. Based upon her review of relevant materials, Ms. Berger performed a radiation dose assessment on Mr. Burleson's exposure to thoriated tungsten electrodes and found that:

> [a]n assessment of his radiation dose potential during that short time period, based upon generous assumptions of work duration, airborne dust concentration and other input parameters, results in an estimate of 0.09 microrem per year. Thus it is hypothetically possible that he could have incurred a total dose,

over his two-year employment duration, of as much as 0.18 microrem.

*Id.* at p. 15. In an attempt to place Mr. Burleson's total radiation exposure in perspective, Ms. Berger compared the radiation dose assessment of 0.18 microrem with that based on Plaintiff's smoking history and found that:

> [b]ecause the annual average dose (CEDE) per pack of cigarettes smoked per day is about 1,300,000 microrem (from the naturally-occurring radioactivity that is present in main-stream tobacco smoke), his annual radiation dose from smoking alone was on the order of 2,600,000 microrem. In fact, if the Plaintiff had smoked just a single cigarette over that 45–year period, he would have incurred almost 2000 times the dose estimated for his two-year TIG welding experience at the Boyd Stainless Steel Plant.

*Id.* at p. 18.

The Defendants also offered as Exhibit C the Affidavit of Dr. George L. DeClos in support of their position that Mr. Burleson's total radiation exposure to thoriated tungsten electrodes did not cause his lung and throat cancer. Dr. DeClos is a practicing physician who is board certified in the specialty areas of internal medicine, pulmonary diseases and occupational medicine. *See* Exhibit C, pg. 1, to Defendant's Second Motion for Summary Judgment. Dr. DeClos was asked by Defendants to perform an independent review for the purpose of determining whether Mr. Burleson's exposure to thoriated tungsten in welding rods resulted in Plaintiff's lung and/or throat cancers. Dr. DeClos offered the following opinion:

> Based on reasonable medical probability, my professional opinion is that the work Mr. Burleson performed using thoriated

tungsten welding rods was not causally related to the development of either his tonsillar cancer or his lung cancer. Rather, the most significant causal risk factors for these cancers are his extensive smoking history (for both the tonsillar and lung cancers) and his history of alcohol use (for his tonsillar cancer).

This opinion is based on the following:

1. There is no support in the scientific literature that documents a causal association between exposure to 2% thoriated tungsten welding rods and either lung or tonsillar cancer in humans. . . .

\* \* \* \* \* \*

2. The total dose of radiation that Mr. Burleson experienced over his 2 years as a welder in the Boyd Unit stainless steel plant, estimated by Ms. Berger as being in the range of 0.18 microrems, was exceedingly low, even when assuming a worst case scenario as Ms. Berger did. This is critical because, of all of the factors that should be considered in determining causation, the total radiation dose is the most central to this case. In her report, in addition, Ms. Berger makes quantitative comparisons to other potential exposures to radiation sustained by the general population in the course of daily life, indicating that Mr. Burleson's exposure would have been many orders of magnitude below these latter situations. To this I would add, for comparative purposes also, that the annual permissible exposure level (PEL) established by federal OSHA for workplace exposures to radiation is set at 5,000,000 microrems (i.e., 5000 millirems) or 2,000,000,000 times higher than the calculated annual dose for Mr. Burleson. OSHA established this PEL based on an exhaustive review

of the literature documenting that no adverse health effects have been observed below this level.

3. In addition to the actual dose, when evaluating [causal] relationships, between an occupational exposure and cancer, it is important to consider whether sufficient time has elapsed (latency) between the onset of exposure and the development of cancer. Because cancer development is a multistage process that develops over a prolonged period of time, the general consensus in the scientific community and in the epidemiological literature in particular, is that latency is measured in terms of several years, usually 10 to 15 years at a minimum. In Mr. Burleson's case the time elapsed between the onset of exposure (starting work at the stainless steel plant) and the diagnosis of his cancers was less than 2 years. This is simply an insufficient period of time for cancer to develop as a consequence of an occupational exposure to radiation.

4. In sharp contrast to the paucity of literature supporting a cause and effect relationship between thoriated tungsten welding rods and cancer, the literature linking smoking to both throat and lung cancer is abundant, and has been well accepted since the first U.S. Surgeon General Report on the health consequences of smoking was published in 1964. In fact, support for this causal link meets all of the rigorous scientific criteria considered by national and international agencies when determining the cancer-causing potential of a substance, including: a) demonstrated carcinogenicity in both laboratory (in vitro) and animal studies; b) repeated evidence of significantly elevated risks in numerous epidemiological studies of smokers: ranging up to 10–20 times the risk of lung cancer in nonsmokers; and c) establishment of dose-response relationships, indicating that as the amount of smoking (measured as "pack-years" of smoking) increases, so does the risk of cancer. Mr. Burleson had a smoking history estimated by the UTMB physicians as being in the order of 80–90 pack-years, which is extremely high. Additional evidence that his smoking was significant enough to cause adverse health effects in Mr. Burleson is present by the incidental findings, at the time he was being evaluated and treated for his lung cancer, of emphysema and an obstructive ventilatory defect on pulmonary testing. Both of these conditions are strongly associated with cigarette smoking as well.

\* \* \* \* \* \*

6. The cell types of both his tonsillar (squamous cell) and his lung (adenocarcinoma and squamous cell) carcinomas are precisely those cell types that have been most strongly related to cigarette smoking. On the other hand, I know of no studies showing a link between exposure to thoriated tungsten welding electrodes and these specific cell type carcinomas or to any other type of lung or throat cancer.

*Id.* at pgs. 6–8.

As set forth above, the Court has granted Defendants' Motion to Exclude the testimony of Dr. Arch Carson and stricken the exhibits relied upon by Plaintiff which sets forth Dr. Carson's opinions and testimony. In the absence of Dr. Carson's opinions and testimony, the Court finds that the Plaintiff has failed to present competent summary judgment evidence on the issue of causation. *See Munoz v. Orr*, 200

F.3d 291 (5th Cir.2000)(courts are free to grant summary judgment after striking a plaintiff's proffered expert testimony as unreliable). Additionally, Mr. Burleson's conclusory allegation of causation based on his lay opinion is insufficient to create a genuine issue of material fact. Further, the mere fact that thorium dioxide has been classified by certain regulatory organizations as a carcinogen is not probative on the issue of whether Mr. Burleson's exposure to thoriated tungsten electrodes caused his lung and throat cancers. *See Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 196–97 (5th Cir.1996). Also, because Plaintiff has no statistically significant epidemiological studies linking exposure to thoriated tungsten electrodes to lung or throat cancer, he fails to carry his burden on the issue of causation.

On the contrary, Defendants have come forward with competent summary judgment evidence that establishes that there are no material fact issues regarding Mr. Burleson's claim that his exposure to thoriated tungsten electrodes caused his cancers. Certified Health Physicist Carol Berger has calculated Plaintiff's total radiation exposure from thoriated tungsten electrodes at the stainless steel plant at 0.18 microrems. Relying on Ms. Berger's radiation dose assessment, Dr. George DeClos has testified that based on a reasonable medical probability, Mr. Burleson's exposure to thoriated tungsten electrodes at the stainless plant was not the cause of his cancers. Rather, Dr. DeClos testified that the most significant causal risk for Mr. Burleson's cancers are his extensive smoking history for both his lung and throat cancer, and his history of alcohol use for his throat cancer. Given Plaintiff's history of heavy smoking, the abundance of scientific evidence linking smoking to lung and throat cancer, and the absence of scientific evidence linking these cancers to thoriated tungsten electrodes, a reasonable jury could only conclude that Mr. Burleson's cancers were caused from cigarette smoking and not from exposure to thoriated tungsten electrodes.

Based upon the above findings and the Court's review of the Plaintiff's remaining summary judgment evidence, Mr. Burleson has produced no evidence that shows he was incarcerated under "conditions which [posed] an unreasonable risk of damage to [his] health." *See Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir.2001). Additionally, for the same reasons, the Court finds that the Plaintiff has presented no evidence that the Defendants acted with deliberate indifference. The Defendants' summary judgment evidence demonstrates that exposure to thoriated tungsten electrodes does not pose a substantial risk of serious harm. As such, the Defendants could not have been aware of facts from which an inference could be drawn that there was a substantial risk of serious harm to Plaintiff, not could they have drawn such an inference. *Id.* Accordingly, the Defendants are entitled to judgment as a matter of law. *See Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir.2001)(summary judgment appropriate where the evidence would not permit a reasonable jury to find against the defendant).

### E. Qualified Immunity

Before reaching the issue of whether an official is entitled to qualified immunity, the Court is to first determine whether a constitutional violation exists. *See Hare v. City of Corinth, Ms.*, 135 F.3d 320, 323 (5th Cir.1998). If the Court finds that a constitutional violation exists, then the Court examines the objective reasonable-

ness of the defendant's conduct in light of the clearly established law. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In the instant case, the Court has found that Plaintiff has failed to present competent evidence on the issue of causation. Additionally, the Court has further found that there is no evidence that Mr. Burleson was confined under conditions that posed an unreasonable risk of harm nor is there any evidence to suggest that Defendants acted with deliberate indifference. As such, the Plaintiff has failed to state a claim of constitutional dimension; therefore, the Court need not address the issue of qualified immunity. Accordingly,

**IT IS, THEREFORE, ORDERED** that Defendants' Motion to Exclude the Testimony of Dr. Arch Carson be and hereby is **GRANTED** and the opinions and expert testimony of Dr. Arch Carson be and hereby are **EXCLUDED** from evidence.

**IT IS FURTHER ORDERED** that Defendants' Second Motion for Summary Judgment be and hereby is **GRANTED** and this matter be and hereby is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that all relief not granted herein be and hereby is **DENIED**.